# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Martinez A. Terry,
      Petitioner,

      vs.                        Case No. 1:08cv820
                                  (Spiegel, S.J.; Wehrman, M.J.)

Warden, Lebanon Correctional
Institution,
      Respondent.

## REPORT AND RECOMMENDATION

Petitioner, an inmate in state custody at the Lebanon Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The case is before the Court on the petition as amended (Docs. 3, 13); respondent's return of writ with exhibits responding to the original petition (Doc. 12); respondent's supplemental return of writ responding to additional claims alleged in the amended petition (Doc. 15); and the transcript of the state trial proceedings, which was filed by respondent in accordance with an order issued by this Court on December 8, 2009 (Doc. 16; *see also* Doc. 14).

## Background

On May 27, 2003, the Hamilton County, Ohio, grand jury returned a seven-count indictment against petitioner and three co-defendants. (Doc. 12, Ex. 1). In the indictment, petitioner was specifically charged with one count of aggravated robbery in violation of Ohio Rev. Code § 2911.01(A)(1) with firearm specifications (Count One); one count of robbery in violation of Ohio Rev. Code § 2911.02(A)(2) with firearm specifications (Count Two); two counts of felonious assault in violation of Ohio Rev. Code § 2903.11(A) with firearm specifications (Counts Three and Four); one count of receiving stolen property in violation of Ohio Rev. Code § 2913.51(A) (Count Five); and one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(3) (Count Six). (*Id.*).

The case proceeded to a trial before a jury, which found petitioner guilty as charged.  On April 20, 2004, the trial court sentenced petitioner to terms of imprisonment totaling twenty-three (23) years, which consisted of the following consecutive prison terms: a ten-year prison term for the aggravated robbery charged in Count One, to be served after a three-year prison term on one of the attached firearm specifications; an eight-year prison term for the felonious assault charged in Count Three; a one-year prison term for receiving stolen property as charged in Count Five; and a one-year prison term for having weapons while under disability as charged in Count Six.[1]  (*Id.,* Ex. 2).

With the assistance of new counsel, petitioner timely appealed his convictions and sentence to the Ohio Court of Appeals, First Appellate District.  In his brief on appeal, petitioner raised the following assignments of error:

1.  The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of aggravated robbery, robbery, felonious assault, weapons under disability, and receiving stolen property, as those findings were not supported by sufficient evidence.

2.  The jury erred to the prejudice of the Defendant-Appellant by finding him guilty of aggravated robbery, robbery, felonious assault, weapons under disability, and receiving stolen property, as those findings were contrary to law.

3.  The trial court erred to the prejudice of the Defendant-Appellant by overruling his Motion for Acquittal under Ohio Criminal Procedure Rule 29.

4.  The trial court erred to the prejudice of Defendant-Appellant by not granting his motion to suppress the identification evidence.

5.  The trial court erred to the prejudice of Defendant-Appellant by allowing the prosecution to dismiss seven of nine black jurors.

---

[1]  Petitioner also was sentenced to eight-year prison terms on the robbery and felonious assault charges in Counts Two and Four.  (Doc. 12, Ex. 2).  The court ordered those sentences "to be served concurrently with each other."  (*Id.*).  In addition, the remaining firearm specifications were merged for sentencing purposes into the specification attached to Count One that resulted in the three-year prison sentence.  (*Id.*).

6.  The trial court erred to the prejudice of Defendant-Appellant by not allowing a read-back of testimony to the jury when requested.

7.  The trial court erred to the prejudice of Defendant-Appellant by utilizing sentencing procedures which are unconstitutional.

8.  The trial court erred to the prejudice of Defendant-Appellant by imposing a sentence that is contrary to law.

(*Id.,* Ex. 3).

On August 12, 2005, the Ohio Court of Appeals overruled the assignments of error and affirmed the trial court's judgment.  (*Id.,* Ex. 6).  In its decision, the state appellate court made the following factual findings, which are presumed correct under 28 U.S.C. § 2254(e)(1),[2] regarding the incident that resulted in petitioner's convictions and sentence:

> In the late afternoon hours of May 16, 2003, Njaga Faal was shot in the chest and robbed of at least $3000 outside of 1207 West Galbraith Road in Cincinnati.  Faal saw a man with braids put a handgun in his face, and he saw four or five men rush him, but he did not know which of his assailants had shot him.
>
> An eyewitness heard the gunshot and saw a black Honda automobile waiting to pull out of a parking lot next to the scene of the shooting. Three men were in the car, and a light-skinned black man with a goatee was entering the rear driver's side door, rushing to stuff something in the car.  After this fourth man entered, the car sped away.
>
> The eyewitness called 911 and described the car and its direction of flight to the police.  The police pursued the Honda and pulled it over several miles from the scene of the shooting.  Defendant-appellant

---

[2]  Specifically, 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence."  Petitioner has neither cited nor presented any evidence to rebut the Ohio Court of Appeals' factual findings quoted herein.  Therefore, he has not shown that such findings are erroneous.

3

Martinez Terry was sitting in the front passenger seat. Neil Wynn was driving, Sanford Roberts was behind him, and Antonio Stonestreet was in the back seat behind Terry. As the suspects were exiting from the car, money was literally falling out the doors.

Inside the Honda, the police found $340, clothing, duct tape, a purple latex glove stuffed in the pocket behind the driver's seat, and two guns. One gun, a 9-mm handgun, was found on the floorboard where Terry had been seated. The registered owner of this gun had reported it stolen in a burglary several months prior to the shooting. The second gun, a .45 caliber, was found on the floorboard near where Roberts had been seated. The gun's magazine, containing eight cartridges, was found in the pocket behind the driver's seat with the purple glove. A ballistics examination by a firearms expert matched the .45-caliber automatic to a shell casing found at the scene of the shooting. But without a bullet, the expert could not definitely say that the recovered .45-caliber gun had been used to shoot Faal. The firearms expert also test-fired both weapons recovered from the Honda and testified that they were both operable.

After they were searched, the police found $920.01 on Roberts, $5002.01 on Stonestreet, and $841.91 on Wynn. $1,006 was found in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. The police also found a purple latex glove in Terry's pants' pocket and a flattened roll of duct tape in Stonestreet's pocket.

As a result of the gunshot wound, Faal very nearly died. He has had several surgeries to remove his spleen and part of his intestines, and he will have to have future surgeries.

The police interviewed Faal in the hospital a few days after the shooting. Faal identified Terry out of a six-man photographic array and said that Terry was the man who had put the handgun in his face. He did not know if Terry had shot him because after he saw the gun, he was told to lie down and he struggled with the assailants, hitting one in the temple. He then heard a gunshot and noticed that he had been shot in the chest.

Faal also identified Roberts as an assailant after viewing a six-man

4

photographic array.  He was not able to positively identify Stonestreet
or Wynn at that time.  But at trial he positively identified Terry,
Roberts, Stonestreet and Wynn as his assailants.

Roberts, Terry, Stonestreet, and Wynn were indicted by the Hamilton
County Grand Jury on counts of aggravated robbery with firearm
specifications, robbery, and felonious assault with firearm
specifications.  Roberts and Terry were also charged with having a
weapon under a disability, and Terry was additionally charged with
receiving stolen property.  The four defendants were tried together.
Wynn was acquitted, but Roberts and Terry were found guilty on all
counts and firearm specifications.  Stonestreet was found guilty on all
counts but acquitted on the firearm specifications.....

(*Id.,* pp. 2-4).

Thereafter, petitioner filed a *pro se* motion for reconsideration of the
assignment of error challenging the jury selection under *Batson v. Kentucky,* 476
U.S. 79 (1986).  (*Id.,* Ex. 7).  The motion was summarily overruled on September
14, 2005 without opinion.  (*Id.,* Ex. 8).

In the meantime, petitioner's appellate counsel filed a timely appeal to the
Supreme Court of Ohio, asserting as propositions of law the same claims of error
that had been raised on direct appeal to the Ohio Court of Appeals.  (*See id.,* Ex. 9).
On November 23, 2005, the state supreme court *sua sponte* ordered that "this cause
be held for the decisions in Supreme Court Case Nos. 04-1771, *State v. Quinones,*
and 04-1568, *State v. Foster*."  (*Id.,* Ex. 11).  On May 3, 2006, the court reversed
the appellate court's judgment on the two propositions of law challenging the
sentencing decision as unconstitutional and contrary to law; the matter was
remanded to the trial court "for resentencing consistent with *State v. Foster,* [845
N.E.2d 470 (Ohio 2006)]."  (*Id.,* Ex. 12).

On November 14, 2005, while the appeal filed by appellate counsel on
petitioner's behalf was pending before the state supreme court for ruling, petitioner
filed a *pro se* application under Ohio R. App. P. 26(B) for reopening of the direct
appeal with the Ohio Court of Appeals, First Appellate District.  (*Id.,* Ex. 13).
Petitioner alleged in the application that he was denied the effective assistance of
appellate counsel, who failed to raise claims on direct appeal as federal
constitutional issues and failed to assert as assignments of error the following
ineffective assistance of trial counsel claims:  (1) trial counsel was ineffective in

failing "to adequately argue, develop, and preserve for appellate review" a claim challenging "unreliable" identification evidence; (2) trial counsel was ineffective in failing to "adequately object to ... the racially discriminatory pattern of peremptory challenges made by the State," and in failing to preserve a *Batson* claim for appellate review by asserting timely objections to the "exclusion of each respective African-American juror" from the "jury venire;" (3) trial counsel was ineffective based on "cumulative" errors specifically stemming from counsel's failure "to interview and subpoena witnesses," to investigate the criminal records of key State witnesses, to seek defense expert witness testimony "regarding the disparity in forensic evidence," and to move for "severance of prejudicial joinder of co-defendants." (*Id.*).

On January 27, 2006, the Ohio Court of Appeals denied petitioner's reopening application, reasoning as follows:

> App. R. 26(B) requires an appellant to file an application to reopen his appeal within ninety days from the date on which the court of appeals journalized its judgment, unless the applicant can show good cause for filing at a later time[.]  The court journalized its judgment on August 12, 2005, and Terry filed his application to reopen his appeal on November 14, 2005[.] Therefore, Terry failed to timely file his application[.]

> Terry neither acknowledges nor offers an excuse for his delay in filing his application[.] Because Terry has failed to show good cause for the filing delay, the court denies his application to reopen his appeal[.]...

(*Id.,* Ex. 14).

On February 7, 2006, petitioner filed a *pro se* motion for reconsideration with the Ohio Court of Appeals. (*Id.,* Ex. 15).  He contended in the motion that he delivered his reopening application to the prison mailroom for mailing to the court on November 7, 2005, three days before the expiration on November 10, 2005 of the 90-day period for filing a timely reopening application. (*Id.*, p. 2). He claimed that the two-day delay by mailroom staff in processing the application resulted in the untimely filing and constituted "good cause" for his failure to meet the filing deadline. (*Id.*). On March 1, 2006, the Ohio Court of Appeals overruled the motion for reconsideration without opinion. (*Id.,* Ex. 16).

Thereafter, petitioner filed a *pro se* appeal to the Supreme Court of Ohio.  In

his memorandum in support of jurisdiction filed on March 13, 2006, petitioner asserted four propositions of law:

> 1.  Appellant Terry was denied his due process right to a direct appeal as of right and access to the courts [when his application for reopening of the direct appeal was dismissed as untimely, despite the fact that the delay in filing was caused by prison mailroom staff in processing the application that was timely submitted for mailing by petitioner].
>
> 2.  Appellant Terry was denied his due process right to a fair trial ..., where the systematic pattern of exclusion of African-American persons from the petit jury violated the Equal Protection Clause of the Fourteenth Amendment.
>
> 3.  Appellant Terry was denied his due process right to a fair trial ..., where trial counsel failed to adequately investigate, develop, argue, and preserve for appellate review his motion to suppress impermissibly suggesti[ve] identification evidence, and where appellate counsel failed to adequately raise claim on direct appeal.
>
> 4.  Appellant Terry was denied his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel ..., where appellate counsel failed to adequately raise constitutional claims on direct appeal as federal claims sufficient to present federal theory of said claims for habeas corpus exhaustion and review.

(*Id.,* Ex. 17).  On May 24, 2006, the Supreme Court of Ohio summarily dismissed the appeal "as not involving any substantial constitutional question."  (*Id.,* Ex. 18).

On June 7, 2006, the trial court resentenced petitioner pursuant to the Supreme Court of Ohio's decision on May 3, 2006 in the direct review proceedings, remanding the matter "for resentencing consistent with *State v. Foster,* [845 N.E.2d 470 (Ohio 2006)]."  (*See id.,* Exs. 12, 20-21).  Petitioner, who was represented by his appellate counsel at the resentencing hearing,  was sentenced to the same terms of imprisonment that had been previously imposed. (*Id.,* Ex. 21).

With the assistance of new counsel, petitioner timely appealed the

resentencing decision to the Ohio Court of Appeals, First Appellate District. He asserted as the sole assignment of error that he "was improperly sentenced to maximum, consecutive terms of imprisonment without findings formerly required by R.C. 2929.19." (*Id.,* Ex. 22). He specifically argued as "issues presented for review" that he was resentenced "under a different, and more onerous, statute" in violation of the Constitution's Ex Post Facto and Due Process Clauses and the "rule of lenity." (*Id.*).

On July 7, 2007, the Ohio Court of Appeals overruled the assignment of error and affirmed the trial court's judgment based on prior decisions "in which we held that resentencing a defendant under *State v. Foster* does not violate either the constitutional ban on ex post facto and retroactive laws or the rule of lenity in statutory interpretation." (*Id.*, Ex. 24).

Petitioner's new counsel timely appealed this decision to the Supreme Court of Ohio. (*Id.,* Ex. 25). On November 21, 2007, the state supreme court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 27).

Petitioner filed the instant federal habeas corpus action in November 2008.[3] (*See* Doc. 3). The petition was amended on December 8, 2009 to include two additional claims inadvertently omitted from the original petition. (*See* Docs. 13, 14). In the petition, as amended, petitioner alleges seven grounds for relief:

**Ground One:** 5th, 6th and 14th Amendments Due Process and Equal Protection Violation where conviction against the sufficiency and weight of evidence.

**Supporting Facts**: The State failed to meet its burden of proving the petitioner guilty and the jury erred to the prejudice of petitioner as those findings of conviction were not supported by sufficient evidence. Also, where those findings were contrary to law[,] said convictions were against the manifest weight of the evidence.

**Ground Two:** 5th Amendment Equal Protection *Batson* Violation.

---

[3] The petition, which petitioner avers was submitted to the prison mailing system on November 17, 2008, was stamped as "received" on November 21, 2008 and as "filed" on November 26, 2008. (*See* Doc. 3).

**Supporting Facts:** *Batson* challenges were made at several junctions of voir dire where the State prosecutor used seven of its nine challenges to dismiss African-Americans of the jury pool.

**Ground Three:** 4th, 5th, 6th and 14th Amendments Violation of Due Process for failure to Suppress Illegal Identification Evidence.

**Supporting Facts:** State witness was shown photo of petitioner by police and was informed that petitioner had been arrested for the charges. The trial court denied the motion to suppress relevant to unreliable and inadmissible identification of petitioner, which resulted in substantial prejudice at trial.

**Ground Four:** 6th and 14th Amendments Due Process Violation based upon Prejudicial Jury Deliberations.

**Supporting Facts:** The jury specifically requested a read-back of trial testimony, or lack thereof. The trial court denied the read-back of trial testimony that thereby resulted in substantial prejudice to petitioner.

**Ground Five:** 6th and 14th Amendments Violation of Effective Assistance of Trial and Appellate Counsel.

**Supporting Facts:** Trial counsel failed to adequately argue and preserve for appellate review of petitioner's motion to suppress, document the pattern of systematic exclusion of African-American jurors, interview and subpoena defense witnesses, and conduct proper discovery. Appellate counsel failed to raise claim of ineffective assistance of trial counsel and failed to present and argue federal constitutional basis of each respective claim on direct appeal.

**Ground Six:** The trial court erred to the prejudice of Petitioner ... by imposing a sentence contrary to law in excess of statutory libert[y] interest, and being based on factors outside statutory guidelines.

**Ground Seven:** The trial court erred to the prejudice of Petitioner ... by utilizing sentencing procedures in violation of the United States and Ohio Constitutions.

9

(Doc. 3, pp. 6, 7, 9, 10, 12(a); Doc. 13, p. 3).

## OPINION

### A.  Petitioner Is Not Entitled To Relief Based On The Claims Alleged In Ground One Challenging The Sufficiency And Weight Of The Evidence

In Ground One of the petition, petitioner alleges that his convictions were obtained in violation of due process because the jury's verdicts of guilt are not supported by sufficient evidence and are against the manifest weight of the evidence.  (Doc. 3, p. 6).

As an initial matter, to the extent petitioner alleges the verdicts of guilt are against the manifest weight of the evidence, his claim is not cognizable in this federal habeas proceeding.  A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.), *cert. denied,* 540 U.S. 930 (2003).

Petitioner's manifest-weight-of-the-evidence claim raises an issue of state-law only.  *See Tibbs v. Florida,* 457 U.S. 31, 41-47 (1982); *State v. Thompkins,* 678 N.E.2d 541, 546-48 (Ohio 1997).[4]  Therefore, only petitioner's sufficiency of evidence claim triggers a federal due process issue subject to review on the merits herein.

In this case, the Ohio Court of Appeals was the only state court to address the merits of petitioner's claim challenging the sufficiency of evidence, which was raised on direct appeal.  Citing only state case-law, the court overruled petitioner's

---

[4]  It is noted that *Thompkins* was superseded on other grounds by state constitutional amendment allowing for state supreme court review of manifest-weight-of-the-evidence claims in death penalty cases.  *See State v. Smith,* 684 N.E.2d 668, 683-84 & n.4 (Ohio 1997), *cert. denied,* 523 U.S. 1125 (1998).

claim of constitutional error, reasoning in pertinent part as follows:

> To determine if a trial court erred in overruling a motion for acquittal under Crim.R. 29, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Likewise, when reviewing the entire record for sufficiency, we make the same determination.

****

> The state proceeded against Terry as either a principal or an accomplice. As an accomplice, Terry "could be held criminally liable as if [he] was the principal offender and was criminally culpable to the same degree as the principal offender." To pursue a conviction under a complicity theory of aiding and abetting, the state "must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."

> Faal testified that he was accosted, shot, and robbed of money. He suffered life-threatening injuries. Several days after the shooting and again at trial, Faal positively and unequivocally identified Terry as the assailant who put a handgun in his face during the robbery. Terry was also a passenger in a Honda seen fleeing from the scene of the crimes immediately after the shooting. The police stopped the Honda several minutes later and apprehended the occupants. The police found $340 in the Honda and thousands of dollars in the pockets of Terry's co-defendants. Later, the police recovered $1006 in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. This money sufficiently corroborated Faal's testimony that he was robbed.

> The police found a stolen 9-mm handgun on the floorboard where Terry had been sitting and a .45-caliber gun on the floorboard where Roberts had been sitting. They also found the .45-caliber gun's magazine and a purple latex glove stuffed into the pocket behind the driver's seat. The state presented testimony demonstrating that the only casing found at the scene of the shooting came from the .45-

caliber gun found in the back of the car.  The state also presented evidence that both weapons found in the Honda were operable.

In light of this evidence, we hold that the state presented more than sufficient evidence to overcome a Crim.R. 29 motion and to convict Terry of aggravated robbery with a firearm specification and robbery. The evidence was also sufficient to support his convictions for felonious assault and receiving stolen property.  Further, Terry stipulated at trial to having a prior drug conviction.  This stipulation and the evidence presented at trial sufficiently supported Terry's conviction for having a weapon under disability.

(Doc. 12, Ex. 6, pp. 4-6) (footnotes to state case citations omitted).

In the usual case, a federal habeas petitioner is not entitled to relief unless the state court's adjudication of his constitutional claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.  An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams,* 529 U.S. at 407-08 (O'Connor, J.).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if the state court arrives at a conclusion opposite

to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942. A legal principle is "clearly established" for purposes of habeas corpus review "only when it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also Bell v. Cone,* 535 U.S. 685, 694 (2002); *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942.

The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

In this case, although the Ohio Court of Appeals cited only Ohio cases, it correctly identified the standard of review governing the resolution of sufficiency of evidence claims, which was established by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307 (1979). As the state appellate court recognized, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *see In Re Winship,* 397 U.S. 358, 363-64 (1970), when a prisoner raises a sufficiency of evidence claim in a petition for writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

This standard does not require the State to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must

defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983).

It is the jury's responsibility as the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the trier of fact which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (*per curiam*), *cert. denied,* 490 U.S. 1049 (1989).

Petitioner was convicted in this case of aggravated robbery, robbery, felonious assault, receiving stolen property, and having weapons while under disability. As the Ohio Court of Appeals pointed out, petitioner was charged with and found guilty of these offenses, as well as on the firearm specification attached to the aggravated robbery count, based on the theory that he acted either as a principal or in complicity with his co-defendants.

Under Ohio's complicity statute, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall ... [a]id or abet another in committing the offense." Ohio Rev. Code § 2923.03(A)(2). The mere presence of the accused at the scene of the crime is insufficient, in and of itself, to prove guilt as an aider and abettor. *State v. Johnson,* 754 N.E.2d 796, 799 (Ohio 2001) (quoting *State v. Widner,* 431 N.E.2d 1025, 1027 (Ohio 1982)). Rather, "[t]he requisite culpability for an accomplice to a crime mirrors the culpability required for the underlying offense." *Johnson v. Hall,* 290 Fed.Appx. 848, 853 (6th Cir. Aug. 27, 2008) (not published in Federal Reporter) (citing *State v. Rice,* 659 N.E.2d 826, 834 (Ohio Ct. App.), *appeal dismissed,* 655 N.E.2d 184 (Ohio 1995)).

The Supreme Court of Ohio has held:

....[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the case.

14

*Johnson,* 754 N.E.2d at 801; *see also Hawkins v. Ganshimer,* 286 Fed.Appx. 896, 903 (6th Cir. July 1, 2008) (not published in Federal Reporter).  The defendant's "[p]articipation in criminal intent may be inferred from [his] presence, companionship and conduct before and after the offense is committed."  *Johnson,* 754 N.E.2d at 801 (quoting *State v. Pruett,* 273 N.E.2d 884, 887 (Ohio Ct. App. 1971)).

Here, a review of the record reveals that the State presented sufficient evidence to establish petitioner's guilt either as a principal or an accomplice on all charges, including the firearm specification.

At trial, before opening arguments, it was stated on the record that the "defendants who have been charged with weapons under disability" had stipulated that "they were under a legal disability as defined by Ohio law."  (Doc. 16, Trial Tr. 1210).

During the presentation of evidence, the victim, Njaga Faal, testified that petitioner was one of the individuals in a group of four to five men who accosted him and robbed him of money on May 15, 2003.  During the altercation, Faal was shot in the chest suffering serious, life-threatening injury.  Although Faal was unable to identify who shot him, he unequicovally identified petitioner both from a photographic array presented to him in the hospital a few days after the incident and at trial as the one in the group who pointed a "gun in [his] face" and ordered him to "lay down on the ground."  (*See id.*, Tr. 1376, 1385, 1387, 1389, 1432, 1442, 1463-65, 1485-86, 1491, 1504-05, 1510, 1758).

As the Ohio Court of Appeals found, further evidence was presented at trial establishing that petitioner was a passenger in the get-away car, who was arrested at the scene when the vehicle was pulled over by the police shortly after the shooting.   The police involved in the stop of the vehicle determined that petitioner was sitting in the front passenger seat.  (*See id.,* Tr. 1254, 1290).

During a search of the vehicle, a 9-mm handgun with a magazine containing eight bullet cartridges was found under the front passenger seat, where petitioner

had been sitting;[5] the registered owner of the gun had reported it stolen a few months earlier on January 24, 2003. (*Id.,* Tr. 1633-34, 1657, 1695-96, 1711-12). A second gun, a .45 caliber pistol, was found on the rear floorboard behind the driver's seat, where co-defendant Sanford Roberts had been sitting; the magazine from that weapon was also recovered from "the pocket ... on the back side of the driver's seat." (*Id.,* Tr. 1702-03, 1839). A .45 bullet casing was recovered from the scene of the shooting. (*Id.,* Tr. 1726-27). A firearms examiner from the Hamilton County Coroner's crime laboratory test fired the two guns obtained from the get-away car and found that they were both "functional," or "capable of expelling or propelling one or more projectiles by action of explosive or combustible element or both." (*Id.,* Tr. 1984, 1989). He also compared the .45 casing obtained from the scene of the shooting with the .45 caliber pistol found in the car; he testified that he was "able to reach a conclusion to a reasonable scientific certainty that the cartridge case was fired by ... the .45 caliber pistol." (*Id.,* Tr. 1990-91).

An officer who assisted in the felony traffic stop of the get-away vehicle testified that he saw "money ... falling out of the vehicle" as the four occupants exited the car. (*Id.*, Tr. 1292). The police recovered $340 from the car and over $6500 from co-defendants Stonestreet, Roberts and Wynn. (*Id.,* Tr. 1299, 1671). Cincinnati police officer Dennis Zucker, who played a role in the traffic stop and was specifically responsible for taking petitioner into custody, testified that he placed petitioner in an interview room for processing on their arrival at the police station. Zucker stated that he visually inspected the interview room before placing petitioner in it, and left petitioner alone in the room briefly to obtain paperwork. Zucker testified that later, after petitioner was removed from the room, he discovered "a small pile of currency" totaling $1,006 on the floor at the "far rear corner of the table, ... at the table leg," which was not present in the room on initial inspection; Zucker stated: "It was just a small pile kicked to the back – in the back of the table leg" located "[r]ight across" from where petitioner had been sitting. (*Id.,* Tr. 1254, 1257-58, 1265-67).

A rational juror could infer from this evidence that petitioner was guilty of the charged aggravated robbery and robbery offenses, with firearm specification.

_____

[5] In addition, a non-fired bullet for the 9-mm pistol was "found loose" on the floorboard "[u]nder the weapon." (Doc. 16, Trial Tr. 1697).

To establish the aggravated robbery offense under Ohio Rev. Code §
2911.01(A)(1), the State was required to prove beyond a reasonable doubt that,
while "attempting or committing a theft offense" or while "fleeing immediately
after the attempt or offense," petitioner had a "deadly weapon on or about [his]
person or under [his] control and either display[ed] the weapon, brandish[ed] it,
indicat[ed] that [he] possess[ed] it, or us[ed] it."  To establish the robbery offense
under § 2911.02(A)(2), the State was required to prove beyond a reasonable doubt
that, while "attempting or committing a theft offense" or while "fleeing
immediately after the attempt or offense," petitioner "inflict[ed], attempt[ed] to
inflict, or threaten[ed] to inflict physical harm on another."  To establish
petitioner's guilt on the firearm specification attached to these counts, the State
was required to prove beyond a reasonable doubt that petitioner was in possession
of a firearm during the commission of the felony, which "was operable or could
readily have been rendered operable at the time of the offense."  *See, e.g., State v.
Gaines,* 545 N.E.2d 68, 71 (Ohio 1989).

Viewing all the evidence presented at trial in the light most favorable to the
prosecution, a rational juror could infer that a theft offense was committed by
petitioner in conjunction with others against the victim Faal; that petitioner had a
deadly weapon in his possession, which he brandished, displayed and used, during
the commission of the theft offense; that petitioner inflicted or threatened to inflict
physical harm on the victim, who was shot in the chest during the commission of
the theft offense; and that petitioner was in possession of an operable firearm when
committing the felony offenses.

The evidence also was sufficient to establish petitioner's guilt beyond a
reasonable doubt of all elements of the felonious assault charge.  Ohio Rev. Code §
2903.11(A) provides in pertinent part that "[n]o person shall knowingly ... (1)
[c]ause serious physical harm to another ...[, or] (2) [c]ause or attempt to cause
physical harm to another ... by means of a dangerous weapon or dangerous
ordnance."  Here, a juror could reasonably infer from the evidence surrounding the
shooting incident that petitioner in conjunction with others caused serious physical
harm, or physical harm by means of a dangerous weapon, to the victim Faal.
Although no evidence was presented to support an inference that petitioner was the
actual shooter, a rational juror could infer from the evidence of petitioner's
"presence, companionship and conduct before and after the offense [was]
committed" that he "knowingly" participated in the shooting of Faal.  *See Johnson,*
754 N.E.2d at 801 (quoting *Pruett,* 273 N.E.2d at 887).

17

Finally, sufficient evidence was presented to establish petitioner's guilt on the remaining charges of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(3) and receiving stolen property in violation of Ohio Rev. Code § 2913.51(A). Viewing the evidence in the light most favorable to the prosecution, a rational juror could infer that petitioner, who stipulated that he was under a legal disability, was in possession of an operable firearm during the altercation with Faal and when fleeing the scene of the shooting in the get-away car. Moreover, a rational juror could infer even more specifically that petitioner was in possession of the 9-mm handgun found on the floorboard of the front passenger seat that he occupied on fleeing the scene; because the registered owner of that weapon had reported it stolen a few months earlier, a rational juror could infer that petitioner received or retained "property of another knowing or having reasonable cause to believe that the property has been obtained through the commission of a theft offense." *See* Ohio Rev. Code § 2913.51(A).

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to relief based on the claims alleged in Ground One of the petition because (1) to the extent petitioner alleges the verdicts of guilt were against the manifest weight of the evidence, he presents an issue of state-law only that is not cognizable in this proceeding; and (2) the Ohio Court of Appeals' adjudication of petitioner's constitutional sufficiency-of-evidence claim is neither contrary to nor involves an unreasonable application of the clearly-established standard of review enunciated by the Supreme Court in *Jackson*.

## B.  Petitioner Has Not Demonstrated He Is Entitled To Habeas Relief Based On The *Batson* Claim Alleged In Ground Two Of The Petition

In Ground Two of the petition, petitioner alleges that the prosecutor improperly used seven of nine peremptory challenges to exclude African-Americans from the jury pool in violation of the Constitution's Equal Protection Clause, as recognized by the Supreme Court in *Batson v. Kentucky,* 476 U.S. 79 (1986). (Doc. 3, p. 7). The claim, which was raised by petitioner on direct appeal to the Ohio Court of Appeals and on further appeal to the Supreme Court of Ohio, is subject to review on the merits.

Upon review of the record, it appears that during *voir dire*, the prosecutor exercised eight out of eighteen available peremptory challenges; out of the eight

18

peremptory challenges that were asserted by the prosecutor, seven were used to remove African-American potential jurors from the venire.[6]

The first on-the-record objection to the prosecutor's use of peremptory challenges was made when the fifth such challenge was asserted to excuse a prospective juror, Mrs. Burns, during the fourth round of *voir dire*, after three prior peremptory challenges had resulted in the dismissal of African-Americans from the jury pool. (Doc. 16, Trial Tr. 1003). The objection was raised in chambers by counsel for a co-defendant, Antonio Stonestreet; the following colloquy ensued:

> **STONESTREET'S COUNSEL:** Your Honor, obviously I believe that we have a *Batson* challenge, based on the dismissal of this last African-American juror.
>
> I believe that there has been a history based upon the [prosecutor's] prior dismissals of African-Americans.
>
> **THE COURT:** Wait a minute. The record would not reflect an intentional history of kicking off African-Americans.
>
> We discussed this off the record yesterday. I suggested off the record that the three challenges by the State, in my opinion, can be offered race neutral reasons. You all agreed.
>
>                                     ****
>
> **STONESTREET'S COUNSEL:** I do not disagree, and I didn't have a chance to finish. I just meant that she was not the first African-American juror who has been dismissed by the State; it's actually the fourth....

---

[6] Specifically, the prosecutor exercised three out of four available peremptory challenges in the first round of *voir dire*; waived all three available peremptory challenges in the second round of *voir dire*; exercised one out of four available peremptory challenges in the third round of *voir dire*; exercised one out of three available peremptory challenges in the fourth round of *voir dire*; and exercised three out of four available peremptory challenges during the final round pertaining to the selection of two alternate jurors. (*See* Doc. 16, Trial Tr. 729, 776-77, 809, 825, 868, 878, 891, 918, 933-34, 977, 986, 994, 1003, 1024, 1055, 1061, 1119, 1160). It, therefore, appears clear from the record that, contrary to petitioner's contention that the prosecutor asserted nine peremptory challenges, only eight such challenges were actually exercised.

> And I can believe that we did not raise this earlier because I believe
> that there were substantial reasons in the past, but I do not believe this
> is one of those reasons, which is why I am raising the *Batson*
> challenge now.

(*Id.,* Tr. 1004-05).

Petitioner's counsel and counsel for co-defendant Sanford Roberts joined in the *Batson* challenge.  (*Id.,* Tr. 1005).  Counsel for co-defendant Neil Wynn also joined the objection for the record, but noted that "this juror ... is kind of a conundrum.  She goes back and forth."  (*Id.,* Tr. 1006).[7]

At that juncture, the court asked the prosecutor to provide a race-neutral reason for the  peremptory challenge.  The prosecutor responded in pertinent part:

> The reason, Judge, several of her responses.  One, that she didn't
> bother reporting crimes to the Cincinnati police because she didn't
> think anything would come of it and she kind of took matters into her
> own hands.  So I have a concern about her, you know, trust issues
> with the Cincinnati police or police in general and kind of street
> justice mentality.
>
> Also, her belief that there is a differentiation [of] treatment under the
> law based on race and socio-economic background.
>
> That's my basis, Judge.  This is a Cincinnati police case.

---

[7] Specifically, during Mrs. Burns' *voir dire* interrogation, Burns indicated that her father and sister had both been murdered in Alabama and that her apartment had been burglarized three times.  (Doc. 16, Trial Tr. 997).  She revealed that her father and sister were killed by people they knew and had been tortured.  (*Id.,* Tr. 999).  On further questioning, Burns indicated that she believed "equal protection of the laws" is "allowed," but "I don't believe that it happens," and that there is differentiation in how people are treated based on "[r]ace and economic background."  (*Id.,* Tr. 1000).  She also stated that she dealt with the burglaries of her apartment on her own without police involvement; she testified that "[t]here was no reason to" contact the police because "[t]ypically you don't get your stuff back, and ... I thought it would be a waste of time."  (*Id.,* Tr. 1001-02).  She said that instead, "I called some people that I knew and told them what was taken and I got it back."  (*Id.,* Tr. 1002).

(*Id.,* Tr. 1006-07).

The court accepted the prosecutor's race-neutral reasons and upheld the peremptory challenge, finding as Wynn's counsel had suggested, that "it would be a conundrum for anybody to let this juror on because it's basically a wild card, a joker, that you have absolutely no idea what she is going to do."  (*Id.,* Tr. 1007-08).  The court continued:

> She suggested that her sister and her father were murdered.  Does she then have an axe to grind to make sure that if those perpetrators were not found that she is going to take it out on these defendants?
>
> ****
>
> ...[I]f the State had not elected to remove [her,] in my opinion – I have presided over trials, many of them in the last 14 years – I'm not sure if I was defense counsel that I would want to have this unknown quantity on the jury....

(*Id.,* Tr. 1008-09).

The remaining three peremptory challenges were exercised by the prosecutor during the final round of *voir dire* for selection of the two alternate jurors.  No objection was made by any of the four defense attorneys when the first of these challenges was asserted for the removal of an African-American from the venire. (*See id.,* Tr. 1055).  When the prosecutor exercised the second challenge, however, to excuse a prospective juror named Mrs. Starks, petitioner's counsel and counsel for co-defendant Roberts objected,[8] arguing in chambers that the State had now used six of its peremptory challenges to dismiss African-Americans from the jury pool.  (*Id.,* Tr. 1061-63).

The trial court ruled that because "no one raised an objection to the State's use of a peremptory on the first alternate, ... I am not going to revisit that, nor does the State have to."  (*Id.,* Tr. 1063).  When asked by the court to provide a race-

---

[8] Counsel for co-defendant Antonio Stonestreet later joined in the objection, but counsel for Neil Wynn did not.  (Doc. 16, Trial Tr. 1064).

neutral reason for dismissing prospective alternate juror Starks, the prosecutor
stated:

> Judge, the juror indicated [counsel for co-defendant Neil Wynn]
> represented her son.  Her son was charged with the same charge that
> two of these defendants are charged with.  And if the Court wants, I
> can put a race neutral reason on for [the first prospective alternate
> juror].  I have no problem with that.  I expected a *Batson*, and I didn't
> get one, but I had a reason, race-neutral reason for that.

(*Id.,* Tr. 1064-65).[9]

The court reiterated that the prosecutor did not have to provide a race-neutral
reason for exercising the first peremptory challenge, which had gone forward
without objection.  (*Id.,* Tr. 1065).  The court also overruled the *Batson* objection
to the second peremptory challenge, finding that the prosecutor had "put forward ...
a race-neutral reason for believing that [Mrs. Starks] could not be fair and impartial
to the State."  (*Id.,* Tr. 1065-66).

The prosecutor exercised one more peremptory challenge to excuse an
African-American, Mrs. Brooks, as a prospective alternate juror.  (*Id.*, Tr. 1119).
When questioned by the prosecutor during *voir dire,* Brooks had stated: "I just feel
if a person has a hesitance in their answer they shouldn't be coerced into saying
something they don't want to say."  (*Id.,* Tr. 1110).  This response prompted the
trial judge, who had noticed Brooks raise her hand during the questioning of
another prospective juror who "was sort of vacillating as to how to answer
questions," why she had done that; apparently, Brooks responded that she was
talking to God.  (*See id.*, Tr. 1110-11).

All four defense counsel joined in a *Batson* objection to the dismissal of
Brooks from the venire.  (*Id.,* Tr. 1119).  The prosecutor stated as the race-neutral
reason for the peremptory challenge:

> I didn't see her raise her hand, but I did hear her make not comments,

---

[9]  When questioned during *voir dire*, Starks had stated that counsel for co-defendant
Wynn had represented her son two years earlier on a federal  "[w]eapons under disability
charge."  (Doc. 16, Trial Tr. 1036-37, 1053).

but several deep breath-type things during [the other prospective juror's] explanation about police officers.

Then her responses regarding when she is asked by the Court why she raised her hand, and she said talking to the Lord.

\*\*\*\*

Talking to God. I just, that's my reason. I just have some definite problems with somebody sitting in the room and talking to the Lord, also the response about I don't feel like we should be coerced when we are hesitant about answering questions. I felt as though she was referring to me talking to her as a juror. So I just have a real negative feeling about her overall as a juror.

(*Id.,* Tr. 1120-21).

Counsel for co-defendant Stonestreet contended in response to the race-neutral reason proffered by the prosecutor: "I think that when you look at the context of the total number of African-American jurors who have been excused, this is just a pattern that is now more than obvious." (*Id.,* Tr. 1122). The prosecutor replied:

For the record, defense challenges have all been of white people. I know they are not of a protected class, but ... I mean, this is jury selection. I believe that I have given a race-neutral reason. I will leave it at that.

(*Id.*).

After hearing the parties' arguments, the trial court overruled the *Batson* objection, reasoning in pertinent part:

I guess being the senior member of the bar here, ... and having tried 6–, 700 jury trials in my life, it's the first time that I have ever seen a juror in the back wa[]ving her hands frantically because of [another juror's] hesitancy. She definitely had something to say, and then that the reason that she gave when I asked her why she was wa[]ving her

23

hands is that she was talking to the Lord.

To me, if I was an attorney, whether I was for the State or for the defense, it seems like it's another wild card.

****

....[T]he race-neutral reason has been offered as pertains to this particular juror.  I have no reason that it is not what the State has suggested.

(*Id.,* Tr. 1122-24).

Petitioner challenged the trial court's rulings on direct appeal.  The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing the merits of petitioner's claim of constitutional error in the jury selection process, made findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[10] and ruled in relevant part as follows:

In *Batson* ..., the Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution.  A *Batson* claim for purposeful discrimination in juror selection encompasses three steps.  First, a defendant must establish a prima facie case of purposeful discrimination by demonstrating that members of a cognizable racial group have been peremptorily challenged, and that the facts and any other relevant circumstances raise an inference that the prosecutor has used the challenges to exclude jurors because of their race.   Once this burden is met, the state must then provide a race-neutral explanation for the striking of a particular juror.  If the state puts forth a race-neutral explanation, the trial court must then decide, on the basis of all the circumstances, whether the defendant has proved purposeful racial discrimination. These circumstances include whether the prosecutor's proffered reason for striking a panelist of a potentially targeted racial group applies just as well to an otherwise similar panelist of a different race

---

[10] *See supra* p. 3 n.2.

24

who is permitted to serve.

The race-neutral explanation given by the prosecutor during a *Batson* challenge does not need to rise to the level justifying a challenge for cause.  We will not reverse a trial court's finding of no discriminatory intent unless the finding was clearly erroneous.

In his fifth assignment of error, Terry, an African-American, argues that the trial court erred by allowing the prosecution to dismiss seven of nine African-Americans because of their race.  But in his argument, Terry restates and changes the issue:  he argues that the trial court erred in allowing the state to use seven of nine peremptory challenges to dismiss members of the jury pool who were African-American.  We are hampered in our review of either issue because Terry does not specify, and the record does not clearly demonstrate, the race of the jurors who served and the race of those dismissed by the state.

But the record does indicate that Terry objected at trial after the state's challenge of three African-American potential jurors, Burns, Starks and Brooks.  After each objection, the trial court found that Terry had established a prima facie case of purposeful discrimination and required the state to put forth a race-neutral explanation for the challenge.  With respect to all three persons, the court accepted the state's race-neutral explanation for the dismissal and rejected a finding of discriminatory intent.  We review these determinations for error.

Before we undertake our review, we emphasize that a *Batson* challenge shifts the burden to the prosecutor to produce a race-neutral basis for the dismissal.  This duty belongs to the prosecutor, and if she fails, neither the trial court nor an appellate court can substitute a race-neutral reason that can withstand a *Batson* challenge.  In this case, the trial court accepted the state's explanation but also articulated its own justification.  We limit our review to the state's proferred explanation.

### Potential Juror Burns

The state expressed two reasons for excluding Burns.  First, her responses indicated that she did not feel the police would provide an

25

adequate response to her reporting of a crime and that she had a "street justice mentality." Second, Burns stated her belief that there was different treatment under the law based upon a person's race and socioeconomic background. After allowing the defense to comment, the trial court found this explanation race-neutral and overruled the *Batson* challenge.

The facts of this case support the state's explanation. When asked by the prosecutor whether she believed "that all people are allowed to have equal protection of the laws?" Burns replied, " I believe it is allowed. I don't believe that it happens." She went on to say that there was different treatment under the law based upon "race and economic background." When the prosecutor tried to explore Burns's attitude toward the police after she was the victim of three burglaries, Burns said that she "dealt with [her burglaries] on [her] own" and did not report them because "it would be a waste of time." She said, "I took care of it myself. *** I called some people that I knew and told them what was taken and I got it back."

In light of Burns's comments, we hold the trial court did not err in accepting the prosecutor's race-neutral explanation for the challenge.

### Potential Juror Starks

The state's proferred reason for dismissing Starks was that defense counsel for co-defendant Wynn had represented Starks's son two years earlier on a federal charge of possessing a firearm while under a disability. She further noted that Terry and his co-defendant Roberts were being prosecuted on similar state charges for possessing a firearm while under a disability. The state's explanation was supported by Starks's testimony, and after allowing the defense to comment, the court accepted it as a race-neutral basis for the challenge. We do not find error in this.

### Potential Juror Brooks

The state explained that it dismissed Brooks because she made "several deep breath-type things" while another potential juror was

26

discussing police officers, and because she gave two strange responses during voir dire.  The first response came after the trial court asked her why she had raised her hand: she said that she was talking to the Lord.  Later, when asked by the prosecutor if she wanted to respond to any of the questioning that had already occurred, she stated that she did not feel people should be coerced into saying something that they do not want to say.  The prosecutor told the court that she felt the later comment was directed at her, and that she had an overall "negative feeling" about Brooks as a juror.

After listening to comments from the defense, the court accepted the state's race-neutral explanation, and we cannot say that this finding was clearly erroneous.  "An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge" if it is "sufficiently specific to provide a basis upon which to evaluate [its] legitimacy." The trial court stated that it had no reason not to believe the prosecutor, and we will not disturb this determination where the record supports the state's basis.

Accordingly, we affirm the trial court's determination of no discriminatory intent in the state's use of peremptory challenges to dismiss potential jurors Burns, Starks, and Brooks....

(Doc. 12, Ex. 6, pp. 8-12) (footnote citations omitted).

"It is well settled that a state denies a defendant equal protection of the laws when he is tried before a jury from which members of his race have been purposefully excluded."  *United States v. Harris,* 192 F.3d 580, 586 (6th Cir. 1999) (citing *Strauder v. West Virginia,* 100 U.S. 303 (1879)).  In *Batson*, the Supreme Court extended this principle to the use of peremptory challenges in the selection of the petit jury, holding that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  *See Batson,* 476 U.S. at 85-89.

As the Ohio Court of Appeals recognized in the instant case, the *Batson* Court adopted a three-step approach for evaluating a claim that the prosecutor used

peremptory challenges to exclude jurors on the improper basis of race. *See, e.g., Miller-El v. Cockrell,* 537 U.S. 322, 328-29 (2003) (internal citations to *Batson* omitted). First, the defendant must make a *prima facie* showing of purposeful discrimination by the prosecutor in the selection of the jury. *Batson,* 476 U.S. at 96-97; *see also Hernandez v. New York,* 500 U.S. 352, 358 (1991) (plurality opinion). A defendant establishes a *prima facie* case by showing he is a member of a cognizable racial group; the prosecutor has exercised peremptory challenges to remove from the jury members of the defendant's race; and these facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude persons from the petit jury on account of their race. *Harris,* 192 F.3d at 586 (citing *United States v. Hill,* 146 F.3d 337, 340 (6th Cir. 1998) (quoting *Batson,* 476 U.S. at 96)). In *Batson,* 476 U.S. at 96-97, the Supreme Court stated:

> In deciding whether the defendant has made the requisite [*prima facie*] showing, the trial court should consider *all relevant circumstances*. For example a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

(Emphasis added). *See also Moore v. Mitchell,* 531 F.Supp.2d 845, 898 (S.D. Ohio 2008) (Dlott, J.) (under the first step of the *Batson* inquiry, "[t]he trial court should consider all relevant circumstances including, if applicable, whether the prosecutor has demonstrated a pattern of striking minority venire members and whether the prosecutor's statements and questions during voir dire support an inference of discrimination").

Once the defendant makes a *prima facie* showing of purposeful discrimination, the burden shifts to the State to come forward with a race-neutral explanation for challenging minority jurors. *Batson,* 476 U.S. at 97. This is an extremely light burden. *Harris,* 192 F.3d at 586. At this second step of the inquiry, the explanation tendered by the prosecutor need not be persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (*per curiam*); *see also Miller-El v. Dretke,* 545 U.S. 231, 267 (2005) (Breyer, J., concurring). As the Supreme Court explained in *Hernandez*: "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the

juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360 (plurality opinion).

It is not until the third and final step of the *Batson* inquiry that the persuasiveness of the State's justification becomes relevant. *Purkett,* 514 U.S. at 768. At this point in the process, the court must determine whether the defendant has met his burden of proving purposeful discrimination. *Hernandez,* 500 U.S. at 359, 363 (plurality opinion) (citing *Batson,* 476 U.S. at 98); *see also Purkett,* 514 U.S. at 768 ("the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). In making this determination, the trial court must assess the plausibility and persuasiveness of the prosecutor's race-neutral explanation. *Rice v. Collins*, 546 U.S. 333, 338 (2006); *Dretke*, 545 U.S. at 252.

Factors to consider in evaluating the credibility of the prosecutor's race-neutral explanations include "the prosecutor's demeanor; ... how reasonable, or how improbable, the explanations are; and ... whether the proffered rationale has some basis in accepted trial strategy." *Cockrell,* 537 U.S. at 339. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett,* 514 U.S. at 768. Moreover, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Dretke,* 545 U.S. at 241.

The Supreme Court has indicated that statistical or other evidence regarding "broader patterns of practice" by the prosecution during the jury selection process remain relevant factors to consider at the third stage of the *Batson* inquiry. *See Dretke,* 545 U.S. at 240-41, 253 (in granting habeas relief on a *Batson* claim, the Court began its analysis by pointing out that the "numbers describing the prosecution's use of peremptories are remarkable," because (1) "[o]ut of 20 black members of the 108-person venire panel ..., only 1 served;" and (2) "[a]lthough 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution").[11] However, in a case such as this, "where the government's

---

[11] *See also Cockrell*, 537 U.S. at 342-48 (holding that a certificate of appealibility should have issued for review of the habeas petitioner's *Batson* claim in a case where only one African-

peremptory challenges have all (or mostly) been against members of a cognizable racial group to which the [petitioner] belongs," the Sixth Circuit has suggested that the challenged pattern of striking minority jurors must be examined in the context of a "number of factors" tending to support or refute an inference of discrimination; such factors include whether "the percentage of minority members in the ultimate jury is the same or greater" or "significantly less than the group originally drawn for the jury;" whether "there are minority members on the jury but the prosecutor did not use all its peremptory challenges," which would tend to "refute discrimination;"[12] and whether the defense "engaged in a pattern of striking non-minority members," which "might make an inference of discrimination arising from the prosecution's opposing strikes less tenable." *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1521-22 (6th Cir. 1988) (addressing the showing required for a *prima facie* case of discrimination under the first step of the *Batson* inquiry); *see also Stallings v. Bagley,* 561 F.Supp.2d 821, 853-54 (N.D. Ohio 2008).

The trial court's decision at the final step of the inquiry on the ultimate question of discriminatory intent represents a finding of fact to be accorded "great deference" by a reviewing court. *Hernandez,* 500 U.S. at 364 (plurality opinion); *see also Batson,* 476 U.S. at 98 n.21. "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . the finding 'largely will turn on evaluation of credibility.'" *Hernandez,* 500 U.S. at 365 (plurality opinion) (quoting *Batson,* 476 U.S. at 98 n.21)).

In the typical case, the decision will turn on whether counsel's race-neutral explanation for a peremptory challenge should be believed, wherein there "will seldom be much evidence bearing on that issue" and the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* "[E]valuation of

_____

American served on the jury; the Court held that the statistical evidence that the prosecutors used 10 of 14 peremptory strikes to exclude 91% of the eligible African-American venire members "alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors," which was "not weakened" on examination of the State's suspect "defense of the disparate treatment").

[12] In affirming the denial of the defendant's motion for mistrial based on an alleged *Batson* violation in a more recent case, the Sixth Circuit relied in part on the fact that the prosecutor had "apparently waived a number of peremptory challenges leaving open the possibility that an African-American might be on the jury," which "militate[d] against a finding that discrimination motivated the strikes." *United States v. Tucker,* 90 F.3d 1135, 1142 (6th Cir. 1996).

the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428 (1985)). Moreover, "race-neutral reasons for peremptory challenges often invoke a juror's demeanor ..., making the trial court's first-hand observations of even greater importance." *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008). "In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.*

As the Ohio Court of Appeals correctly noted in addressing petitioner's *Batson* claim on direct appeal, a trial court's finding on the issue of discriminatory intent may not be overturned unless the reviewing court is convinced that the determination was clearly erroneous. *See id.* (citing *Hernandez,* 500 U.S. at 369 (plurality opinion)); *see also Rice,* 546 U.S. at 338. In this federal habeas corpus proceeding, however, the Court "must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rice,* 546 U.S. at 338 (quoting 28 U.S.C. § 2254(d)(2)). "Thus, a federal habeas court can only grant [relief] if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.* In addition, the state courts' factual findings on this issue are presumed correct unless petitioner demonstrates by clear and convincing evidence that such findings are erroneous. *See* 28 U.S.C. § 2254(e)(1); *Rice,* 546 U.S. at 338-39; *Dretke,* 545 U.S. at 240; *Purkett,* 514 U.S. at 769; *Hernandez,* 500 U.S. at 366 (plurality opinion).

In this case, the undersigned concludes that the Ohio courts' adjudication of petitioner's *Batson* claim was not an objectively unreasonable application of *Batson* and its progeny. Petitioner established that he and seven prospective jurors excused by the prosecutor are African-American. However, the record reflects that all parties were in agreement that the first three peremptory challenges used by the prosecutor to strike African-Americans from the jury pool were based on legitimate, race-neutral reasons and did not trigger any *Batson* concerns. (*See* Doc. 16, Trial Tr. 1004-05). Furthermore, although *Batson* objections were asserted against the use of three of the peremptory challenges to strike Burns, Starks and Brooks from the venire, both the trial judge and the state appellate court explicitly found that the prosecutor's proffered race-neutral reasons for excusing those jurors were credible and persuasive on the ultimate issue of discriminatory intent. Petitioner has failed to demonstrate by clear and convincing evidence that such findings are erroneous. Moreover, upon review of the trial transcript, this Court

31

agrees with the Ohio Court of Appeals' determination that the prosecutor's race-neutral explanations for excusing those jurors are supported by the record, based on statements and conduct occurring during the prospective jurors' *voir dire* examinations.

Petitioner has neither cited nor submitted clear and convincing evidence of purposeful discrimination by the prosecution sufficient to rebut the presumption of correctness to be accorded the state courts' conclusion that the prosecutor did not discriminate on the basis of race in exercising peremptory challenges in this case. *See* 28 U.S.C. § 2254(e)(1); *Purkett,* 514 U.S. at 769; *Hernandez*, 500 U.S. at 364-66; *Batson*, 476 U.S. at 98 n.21. Petitioner has argued that discriminatory intent can be inferred solely from the fact that the prosecutor exercised seven of eight peremptory challenges against African-Americans. However, this fact standing alone is insufficient "to raise the necessary inference of purposeful discrimination." *Sangineto-Miranda,* 859 F.2d at 1521. As the Sixth Circuit explained in rejecting "the premise that an inference of intentional discrimination will *always* arise if, without more, there is a showing that the prosecution used all its peremptory challenges to exclude blacks," such a per se rule fails to "take into account considerations that may be very relevant, including the percentage of the racial group in the district jury pool or original jury; the pattern of strikes exercised by the defense; the number of strikes available to the government; and the composition of the ultimate jury sworn." *Id.*

As discussed above, it appears from the record that there were race-neutral reasons to justify six of the seven peremptory challenges utilized by the prosecutor against African-Americans in this case. The remaining peremptory challenge was the first of three used by the prosecutor to strike African-Americans during the final round of *voir dire* for two alternate jurors. There is no evidence in the record even remotely suggesting that the dismissal of that juror was racially motivated. Indeed, petitioner is hard-pressed to make such an argument. Although four defense attorneys were involved in the case, not one asserted an objection to the prospective juror's dismissal even though a *Batson* objection had been raised in an earlier round out of concern that the prosecutor was excusing too many African-Americans from the jury pool. The prosecutor stated on the record that she had a race-neutral explanation for excusing the juror, and based on the present record, the undersigned has no reason to disbelieve that assertion.

Petitioner has not argued or otherwise indicated that the prosecutor's proffered reasons for striking an African-American panelist applied as well to an

"otherwise-similar nonblack who [was] permitted to serve." *See Dretke,* 545 U.S. at 241.  Moreover, there is no evidence in the record about the composition of the ultimate sworn jury or that would otherwise suggest the percentage of African-Americans in the ultimate jury was significantly less than the group originally drawn for the jury.  In contrast, there is additional evidence in the record tending to refute an inference of discrimination.  Here, although it appears that defense counsel used most if not all of their peremptory challenges to exclude whites from the jury panel, the prosecutor conversely waived most of the peremptory challenges allotted to her, particularly during the first four rounds of *voir dire*; this left open the possibility that African-Americans would be on the jury deciding petitioner's fate, which militates against a finding that discrimination motivated the prosecutor's strikes.  *Cf. United States v. Tucker,* 90 F.3d 1135, 1142 (6th Cir. 1996).

Accordingly, in sum, the Court concludes that petitioner has not demonstrated that the state courts' adjudication of his *Batson* claim resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent, or is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. §2254(d); *see also Williams,* 529 U.S. at 402-03 (O'Connor, J.).  Petitioner, therefore, is not entitled to habeas corpus relief based on the claim of constitutional error alleged in Ground Two of the petition.

## C.  Petitioner Has Waived The Claim In Ground Three Challenging The Admission Of The Victim's Identification Testimony, And Has Not Demonstrated That Counsel Was Ineffective In Failing To Preserve The Claim For More Than "Plain Error" Review By The State Courts

In Ground Three of the petition, petitioner alleges that he was denied due process when the trial court failed to suppress "[i]llegal [i]dentification [e]vidence."  (Doc. 3, p. 9).

On direct appeal, petitioner argued in support of this claim of constitutional error that the victim, Njaga Faal, "was shown the photo lineup when he was still in the hospital, and had been told that the lineups contained pictures of men who had been arrested for the shooting."  (Doc. 12, Ex. 3, p. 6; Ex. 9, p. 7).  In addition, petitioner stated that there was "no[] evidence that the officer who showed Mr. Faal the photos actually interviewed him []or test[ed] his perception of events that

had occurred."  (*Id.*).

The Ohio Court of Appeals was the only state court to address the merits of this claim.  The court ruled as follows:

> ....Terry states that the trial court erred by not granting his motion to suppress Faal's testimony identifying Terry as an assailant.  Terry argues that the identification testimony resulted from unduly suggestive techniques by the police and was not reliable.
>
> When a witness has been confronted with a suspect before trial, due process requires a court to suppress his identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances.
>
> In his appellate brief, Terry does not cite the part of the record containing the motion to suppress or an objection by defense counsel pertaining to the evidence identifying Terry as one of the assailants.  Our own search of the record indicates that no motion to suppress was filed and no objection was raised.  Under these circumstances, Terry has waived all but plain error.  An alleged error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise.
>
> We cannot find any error in the use of Faal's identification evidence.  Police Officer Calvin Mathis visited Faal in the hospital a few days after the shooting and showed Faal a photographic array containing photographs of six African-American males with cornrows and similar facial hair and features.  Terry's photograph was included in the array.  Faal immediately pointed to Terry's photograph and indicated that he was the one who had shoved the gun in his face.  Terry's photograph was darker than the others, but we cannot say that this flaw rendered the lineup unduly suggestive.
>
> Likewise, even assuming the darker photograph of Terry rendered the array unduly suggestive, we cannot say that the identification was unreliable under all the circumstances.  While Faal did not have a long time to view Terry during the commission of the crimes, he viewed him at close range and with full attention.  Faal gave the investigating

34

officer a description matching Terry prior to having been shown the photographic array with Terry's picture.  Further, Faal unequivocally identified Terry, both in the hospital and at trial, as the assailant that shoved a gun in his face.  Under these circumstances, we hold that the identification was reliable.

Having found no error in the use of the identification evidence, we do not need to complete the plain error analysis to determine whether the jury would have acquitted Terry absent the identification testimony....

(Doc. 12, Ex. 6, pp. 6-8) (footnote citations omitted).

As an initial matter, respondent contends that this claim is waived because petitioner's trial counsel failed to object at trial to the admission of the victim's identification testimony, and the Ohio Court of Appeals relied on that procedural default when it refused to review the claim except for "plain error" on direct appeal.  (Doc. 12, Brief, pp. 24-26).

It is well-settled that, on federal habeas corpus review, a court may be barred from considering an issue of federal law from a judgment of a state court if the state judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision.  *Harris v. Reed,* 489 U.S. 255, 260-62 (1989).  The "adequate and independent state ground" doctrine has been applied to state decisions refusing to address the merits of a federal claim because of violations of state procedural rules, including the failure to make a timely objection at trial.  *Id.* at 261; *Wainwright v. Sykes,* 433 U.S. 72, 86-87 (1977); *see also McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985).

Such a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on the state procedural bar. *Harris,* 489 U.S. at 263.  In cases where the last state court to render a reasoned opinion on the claim explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim.  *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

In this case, the Ohio Court of Appeals was the only state court to issue a reasoned opinion addressing petitioner's claim challenging the admission of the

victim's identification testimony. As respondent has pointed out (*see* Doc. 12, Brief, p. 25), the court clearly and expressly stated that because it appeared from the record that "no objection was raised" at trial, petitioner had "waived all but plain error." (Doc. 12, Ex. 6, p. 7). By thus confining the court's review to "plain error" under state law, petitioner committed a procedural default to the extent he thereby removed or, in other words, failed to "fairly present" his federal constitutional claim to the state courts. *Cf. McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987).

As respondent has argued, the court's review solely for plain error based on its determination that the claim was otherwise "waived" does not constitute a waiver or non-enforcement of the state procedural bar by the reviewing court. *See, e.g., Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir. 2003); *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir. 1989)), *cert. denied,* 532 U.S. 989 (2001). Therefore, petitioner's procedural default bars consideration of the claim alleged in Ground Three absent a showing of cause and prejudice or that a "fundamental miscarriage of justice" will result if the claim is not considered. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Sykes,* 433 U.S. at 87.

Here, petitioner has not demonstrated that failure to consider the claim will result in a "fundamental miscarriage of justice," or in other words, that the alleged error "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). However, petitioner has argued ineffective assistance of counsel as "cause" for his procedural default. Specifically, he alleges in Ground Five of the petition that his trial counsel was ineffective in failing to move for the suppression of the identification evidence and that his appellate counsel was ineffective in failing to assert the ineffective assistance of trial counsel claim on direct appeal. (*See* Doc. 3, p. 12(a)).

Ineffective assistance of counsel may constitute cause for a procedural default. *See, e.g., Murray,* 477 U.S. at 488. However, in order to establish cause based on this argument, the ineffective assistance of counsel claim itself must not be procedurally-defaulted. *See Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.), *rev'd on other grounds,* 546 U.S.

36

74 (2005) (*per curiam*).

Here, petitioner raised the ineffective assistance of counsel claims to the state courts in his *pro se* application for reopening of the direct appeal filed with the Ohio Court of Appeals on November 14, 2005. (*See* Doc. 12, Ex. 13). The Ohio Court of Appeals relied on another arguably adequate and independent state ground when it denied the reopening application because the pleading was not filed in a timely manner within 90 days after the journalization of the direct appeal decision as required by Ohio R. App. P. 26(B). (*See id.,* Ex. 14).

However, petitioner has argued as cause for this default that although he delivered his reopening application to the prison mailroom for mailing to the state appellate court three days before the 90-day filing deadline, the mailroom staff's two-day delay in processing the application resulted in its untimely filing. The Sixth Circuit has held that inaction by prison mailroom officials, which results in a *pro se* prisoner missing a filing deadline, may constitute cause for the procedural default even in states, such as Ohio, where the prison mailbox rule set forth in *Houston v. Lack,* 487 U.S. 266 (1988), does not apply. *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). In *Maples,* 340 F.3d at 439, the Sixth Circuit reasoned:

> Where a pro se prisoner attempts to deliver his petition for mailing in sufficient time for it to arrive timely in the normal course of events, ... the rule is sufficient to excuse a procedural default based upon a late filing. If the prison had accepted and mailed [the petitioner's] petition when he first attempted to deliver it–five days before the state's deadline–we have no doubt that it would have been timely delivered in the normal course of events. [Petitioner] has therefore shown cause to excuse his procedural default.

This case involves a closer issue because only three days remained in the filing period when petitioner delivered his reopening application to the prison mailroom for mailing to the Ohio Court of Appeals. Nevertheless, out of an abundance of caution, the Court assumes that petitioner has demonstrated "cause" for the untimely filing of his reopening application, which requires the Court to address the merits of his ineffective assistance of counsel claims as they pertain to his third ground for relief.

To establish that his trial and appellate attorneys were ineffective, petitioner must demonstrate both (1) they made such serious errors they were not functioning

37

as "counsel" guaranteed by the Sixth Amendment; and (2) their allegedly deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Under the first prong of the *Strickland* test, petitioner must show that counsels' representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsels' errors, the trial/appeal outcome would have been different. *See id.* at 694. Petitioner has met his burden if he shows that the trial/appeal result would "reasonably likely have been different absent the errors." *Id.* at 695.

Here, as the Ohio Court of Appeals apparently understood in reviewing the underlying claim alleged in Ground Three of the petition for "plain error," a conviction based on identification testimony that follows a pretrial identification violates due process when "the pretrial identification procedure is so 'impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir. 1994) (quoting *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir. 1986) (in turn quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968)), *cert. denied,* 482 U.S. 918 (1987)), *cert. denied,* 515 U.S. 1145 (1995). It is the likelihood of misidentification which violates the defendant's due process right. *Neil v. Biggers,* 409 U.S. 188, 198 (1972).

The due process standard is premised on the concern that the trustworthiness of an eyewitness's identification can be easily undermined by improper police suggestion in circumstances where there already is a danger of misidentification because the witness is called upon to identify a stranger observed only briefly, under poor conditions, at a time of extreme emotional stress and excitement. *See Manson v. Brathwaite,* 432 U.S. 98, 112 (1977); *Simmons,* 390 U.S. at 383-84; *United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir. 1976). Therefore, the determination of whether the eyewitness's identification testimony is admissible at trial turns on the reliability of that testimony. *Manson,* 432 U.S. at 114; *see also Summitt v. Bordenkircher,* 608 F.2d 247, 251 (6th Cir. 1979), *aff'd sub nom. Watkins v. Sowders,* 449 U.S. 341 (1981).

The court must engage in a two-step analysis in deciding whether an accused's right to due process has been violated through the use of a pretrial identification procedure. The court must first consider whether the procedure was unduly suggestive. *Ledbetter,* 35 F.3d at 1070-71 (citing *Thigpen,* 804 F.2d at

895).  The defendant bears the burden of proving this element.  *Id.* at 1071 (citing *United States v. Hill,* 967 F.2d 226, 230 (6ᵗʰ Cir.), *cert. denied,* 506 U.S. 964 (1992)).  If the court finds that the procedure was unduly suggestive, it must next evaluate the "totality of the circumstances" to determine whether the pretrial identification was nevertheless reliable.  *Id.*; *see also Neil,* 409 U.S. at 199-200. The factors to be considered in assessing the reliability of the identification include:  (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when identifying the defendant; and (5) the length of time between the crime and the identification.  *Manson,* 432 U.S. at 114; *Neil,* 409 U.S. at 199-200; *United States v. Gatewood,* 230 F.3d 186, 193 (6ᵗʰ Cir. 2000), *cert. denied,* 534 U.S. 1107 (2002); *Ledbetter,* 35 F.3d at 1071.

Here, the Ohio Court of Appeals reasonably concluded from the facts presented that the pretrial identification procedure utilized to obtain Faal's initial identification of petitioner as one of his assailants was not unduly suggestive and that, in any event, Faal's identification testimony was reliable "under all the circumstances."  (Doc. 12, Ex. 6, p. 7).  Petitioner has not cited or provided clear and convincing evidence to rebut the court's specific factual findings in support of those conclusions.  Indeed, there is no evidence in the record even remotely suggesting, as petitioner has alleged in the petition, that there were any irregularities in the presentation of the photographic array to petitioner at the hospital a few days after the shooting or that any other circumstances existed tending to refute the reliability of Faal's consistent and unequivocal identification of petitioner from the photographic array and at trial as the assailant who "shoved the gun in his face."  (*See id.*).

The fact that petitioner's photograph apparently was "darker than the others" in the "array containing photographs of six African-American males with cornrows and similar facial hair and features" is insufficient to raise concerns of constitutional dimension about counsels' failure to preserve the claim for more than "plain error" review.  *Cf. United States v. Irorere,* 69 Fed.Appx. 231, 236 (6ᵗʰ Cir. June 11, 2003) (not published in Federal Reporter) (holding that although "including one color photograph of a criminal defendant among a group of black-and-white photographs is unduly suggestive," the defendant had "not met his burden of proving that the use of his darker-toned photograph in a photo array, exclusively depicting a 'mug shot' marker, rendered the overall pretrial identification procedure ... unduly suggestive"), *cert. denied,* 540 U.S. 1204

(2004); *see also United States v. L'Allier*, 838 F.2d 234, 240 (7th Cir. 1988) ("minor differences" in the "exposure and quality of the photographs" used in the array, standing alone, "do not establish that the confrontation procedure was impermissibly suggestive").

Accordingly, in sum, the Court concludes that petitioner has waived the claim alleged in Ground Three of the petition challenging the victim's testimony identifying petitioner as one of his assailants.  Although petitioner may be able to demonstrate cause for his procedural default of claims that his trial and appellate counsel were ineffective in failing to preserve the underlying claim of constitutional error for more than "plain error" review, petitioner has not demonstrated that the underlying claim was sufficiently meritorious to trigger any concerns that counsels' challenged conduct rose to the level of ineffective assistance in this case.   Petitioner, therefore, is not entitled to relief based on the claim alleged in Ground Three of the petition.

### D.  Petitioner Is Not Entitled To Habeas Relief Based On The Claim Alleged In Ground Four Of "Prejudicial Jury Deliberations"

In Ground Four of the petition, petitioner alleges that the trial court's denial of the jury's request during deliberations for a "read-back of trial testimony" resulted in "substantial prejudice" to him.  (Doc. 3, p. 10).

The issue arose at trial during jury deliberations when the the trial court received the following question from the jury: "What is the relationship of the black Honda's owner to the defendants?"  (*See* Doc. 16, Trial Tr. 2200).  The jury panel was brought to the courtroom at that point, and the following colloquy ensued on the record in open court:

> **THE COURT:** Having discussed this question with the attorneys, the only thing I can answer is that you will have to use your collective recollection of the testimony to answer that particular question.  I cannot give you anything else.  And if it was not part of the record, then you have to proceed based upon what was presented to you.
>
> Knowing that probably doesn't answer your question, but are there any other questions that the foreperson wishes to address to the Court at this point?

**JUROR FOREPERSON:**  If I'm not mistaken you just said that if it's not in the transcript –

**THE COURT:**  If it's not part of the record then you – then, well, you have heard all the evidence.

**JUROR FOREPERSON:**  Can we get the record to kind of go back through that?  Is that possible or not?

**THE COURT:**  It would be almost an impossibility.  When cases are appealed it takes the court reporters weeks or months in order to get a transcript prepared.

To suggest that testimony from Friday until yesterday can be secured in that fast a time would be an almost unreasonable burden to be placing on a court reporter.

Anything else at this point?

**JUROR FOREPERSON:**  No sir.

(*Id.*, Tr. 2200-01).

On direct appeal, petitioner argued in general terms that the trial court "abused its discretion in refusing to grant a read-back of trial testimony," without providing any factual support for his contention that he was prejudiced by the ruling.  (Doc. 12, Ex. 3, pp. 7-8; Ex. 9, pp. 10-11).  The Ohio Court of Appeals, which was the only state court to address this claim on the merits, overruled the assignment of error, finding "no abuse of discretion in the trial court's refusal to reread testimony to the jury."  (*Id.,* Ex. 6, p. 12).

As respondent has contended in the return of writ (*see* Doc. 12, Brief, pp. 26-29), petitioner failed to present a claim of federal constitutional dimension to the state courts, and any claim of error under the state-law "abuse of discretion" standard is not cognizable in this federal habeas proceeding.  *See, e.g., McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987); *see also* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

41

In any event, even assuming petitioner had alleged a federal constitutional claim on direct appeal in the state courts, he has not demonstrated that the trial court's challenged ruling had any impact, either positive or negative, on the jury's determination of his guilt or innocence.  Indeed, the only discernable relevance the question could have had for the jury in reaching its verdicts pertained to co-defendant Neil Wynn, the driver of the get-way vehicle, who ultimately was acquitted on all charges.

Accordingly, petitioner has not demonstrated that he is entitled to habeas relief based on the claim alleged in Ground Four of the petition.

### E.  Petitioner Is Not Entitled To Habeas Relief Based On The Ineffective Assistance Of Trial And Appellate Counsel Claims Alleged In Ground Five

In Ground Five of the petition, petitioner alleges that his trial counsel was ineffective in failing (1) "to adequately argue and preserve for appellate review" his claim challenging the admission of the victim's identification testimony; (2) to "document the pattern of systematic exclusion of African-American jurors;" and (3) to "interview and subpoena defense witnesses" and "conduct proper discovery."  (Doc. 3, p. 12(a)).  Petitioner further contends that his appellate counsel was ineffective in failing to raise these ineffective assistance of trial counsel claims as assignments of error and in failing "to present and argue federal constitutional basis of each respective claim on direct appeal."  (*Id.*).

Respondent argues in the return of writ that petitioner has waived his ineffective assistance of counsel claims because he presented them for the first time in an application for reopening of the appeal, which was dismissed by the Ohio courts on state procedural timeliness grounds.  (Doc. 12, Brief, pp. 29-30).  As discussed earlier in addressing the claim alleged in Ground Three, respondent may be able to demonstrate that the prison mailroom's delay in mailing petitioner's reopening application to the Ohio Court of Appeals constitutes cause for his procedural default.  Therefore, the Court will address petitioner's ineffective assistance of counsel claims on the merits.

The claims are subject to review under the two-part standard established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984).  To establish entitlement to relief under *Strickland*, petitioner must demonstrate both (1) his attorneys made such serious errors that they were not functioning as the "counsel"

guaranteed by the Sixth Amendment; and (2) counsels' allegedly deficient performance prejudiced the defense. *See Strickland,* 466 U.S. at 687.

Under the first prong of the *Strickland* test, petitioner must show that counsels' representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsels' perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsels' performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsels' errors, the trial or appeal outcome would have been different. *See id.* at 694. Petitioner has met his burden if he shows that the result of the trial or appeal would "reasonably likely have been different absent the errors." *Id.* at 695.

The Court need not examine the question of whether counsels' performance was deficient before addressing the question of whether petitioner was prejudiced by such performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id.* at 697.

Here, as discussed earlier, petitioner has not demonstrated that his trial counsel was ineffective in failing to object to the identification evidence admitted at trial, or that his appellate counsel was ineffective in failing to raise the corollary ineffective assistance of trial counsel claim on direct appeal. *See supra* pp. 37-40.

In addition, petitioner has not demonstrated that his trial counsel was ineffective in failing to "document the pattern of systematic exclusion of African-Americans" from the jury by the prosecutor in this case. Petitioner has not cited or presented any evidence demonstrating that he would have prevailed on his *Batson* claim if counsel had documented any additional statistical information pertaining to the racial composition of the venire or the ultimate sworn jury. The Court has thoroughly and extensively reviewed the transcript of the *voir dire* proceedings in considering the *Batson* arguments that were asserted by defense counsel at trial, and finds that the four defense attorneys involved in the jury selection process

effectively represented the interests of their clients on this issue.  Therefore, appellate counsel was not ineffective in failing to raise an assignment of error on direct appeal challenging trial counsel's performance in the presentation of the *Batson* claim.

Finally, petitioner has not alleged any facts to support his claims of ineffective assistance based on trial counsel's purported failure to interview and subpoena defense witnesses or "conduct proper discovery."  Petitioner "cannot show deficient performance or prejudice resulting from a failure to investigate if [he] does not make some showing of what evidence counsel should have pursued and how such evidence would have been material." *Hutchison v. Bell*, 303 F.3d 720, 748-49 (6th Cir. 2002) (citing *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied,* 523 U.S. 1079, 1088 (1998),  and *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir.), *cert. denied*, 537 U.S. 1004 (2002), and *cert. denied,* 539 U.S. 938 (2003)), *cert. denied*, 539 U.S.  944 (2003).  Petitioner has not identified any witnesses or other evidence, which his trial counsel should have pursued and failed to discover, that would have tended to exculpate him or assist in his defense.  In the absence of any evidence in the record even remotely suggesting that petitioner's claim can be substantiated or has any factual basis, no showing has been made to establish that counsels' performance was deficient under the first prong of the *Strickland* test or that there was a "reasonable probability" of a different outcome at either the trial or appellate level under the second prong of the *Strickland* test.

Accordingly, in sum, the Court concludes that petitioner has not demonstrated that the ineffective assistance of counsel claims alleged in Ground Five of the petition have any merit.  Therefore, petitioner is not entitled to habeas relief based on that ground.

## F.  Petitioner Is Not Entitled To Habeas Relief Based On The Claims Alleged In Ground Six and Seven Challenging His Resentencing Under *Foster*

In Grounds Six and Seven of the petition, as amended, petitioner alleges that the trial court erred in "imposing a sentence contrary to law" and in violation of the United States and Ohio Constitutions when he was resentenced on June 7, 2006 to the same terms of imprisonment that were originally imposed.  (Doc. 13).  Petitioner was resentenced pursuant to the Supreme Court of Ohio's May 3, 2006 order remanding the matter for resentencing in light of its decision earlier that year in *State v. Foster,* 845 N.E.2d 470 (Ohio 2006).  (*See* Doc. 12, Exs. 12, 20-21).

In *Foster,* the state supreme court held certain provisions of Ohio's sentencing statute were unconstitutional under the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005). Specifically, the court found "Ohio's sentencing statutes offend the constitutional principles announced in *Blakely* in four areas" mandating additional judicial fact-finding before the imposition of (1) more than the minimum term for those who have never served a prison term; (2) the maximum prison term; (3) consecutive prison terms; and (4) repeat-violent-offender and major-drug-offender penalty enhancements. *See Foster,* 845 N.E.2d at 490-94.[13] Turning next to the question of what the appropriate remedy should be to bring about compliance with *Blakely*, the *Foster* court adopted the approach taken in *Booker* of severing from Ohio's sentencing statute the *Blakely*-offending portions of that statute and granting trial courts "full discretion to impose a prison sentence within the statutory range" without having to make findings or give reasons for imposing maximum, consecutive, or more than minimum sentences. *See id.* at 494-98. Because the *Foster* court held that its decision extended to cases then pending in the Ohio courts on direct review, *see id.* at 499, the state supreme court found that the claims raised by petitioner on direct appeal challenging his original sentence had merit and remanded the matter for resentencing pursuant to *Foster*.

In challenging the trial court's resentencing decision in accordance with the state supreme court's remand order, petitioner essentially contends herein that, although he successfully argued on direct review that *Foster* invalidated the original sentence imposed pursuant to unconstitutional sentencing provisions in effect at that time*,* he is entitled to receive a sentence under the "old" law because application of the *Foster* remedy to him violates ex post facto principles. (Doc. 13; *see also* Doc. 12, Exs. 22, 25). This argument, if accepted, would result in a Catch-22 situation and is untenable.

In any event, to the extent that petitioner alleges in Grounds Six and Seven

---

[13] It is noted that a few years after *Foster* was decided, the Supreme Court held in *Oregon v. Ice*, 129 S.Ct. 711 (2009), that consecutive sentencing decisions do not trigger Sixth Amendment *Blakely* concerns. In light of *Ice,* it appears that the provision in Ohio's pre-*Foster* sentencing statute pertaining to consecutive sentencing determinations would now be found to pass constitutional muster under the Sixth Amendment. *Cf. Hooks v. Sheets,* 603 F.3d 316, 321 (6th Cir. 2010) (holding that because the petitioner was "*always* subject to consecutive ... sentences in the discretion of the trial court" in light of *Ice*, his resentencing under *Foster* did not raise ex post facto concerns) (emphasis in original).

that the trial court imposed a sentence contrary to Ohio law and in violation of Ohio's Constitution when it resentenced petitioner to the same prison terms without making certain findings required by statute before *Foster* was decided, his claim is not cognizable in this federal habeas proceeding. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

Moreover, petitioner cannot prevail on any claim that application of the *Foster* remedy on his resentencing violated federal constitutional ex post facto principles. This argument and its various permutations has been thoroughly discussed and universally rejected by the federal and state courts in Ohio. *See, e.g., Sieng v. Wolfe,* No. 2:08cv44, 2010 WL 2232384, at *15 (S.D. Ohio June 2, 2010) (Watson, J.) (unpublished) (and cases cited therein); *Ashley v. Gansheimer,* No. 1:08cv2556, 2010 WL 1924459, at *3-5 (N.D. Ohio May 12, 2010) (O'Malley, J.) (unpublished) (and cases cited therein); *Hatfield v. Warden, Ross Corr. Inst.,* No. 2:08cv1152, 2010 WL 2196282, at *8 (S.D. Ohio May 3, 2010) (unpublished Report & Recommendation) (and cases cited therein), *adopted,* 2010 WL 2196273 (S.D. Ohio May 28, 2010) (Holschuh, J.) (unpublished); *Hooks v. Sheets,* No. 1:07cv520, 2008 WL 4533693, at *3-5, *13-19 (S.D. Ohio Oct. 3, 2008) (Beckwith, C.J.; Hogan, M.J.) (unpublished) (and cases cited therein), *aff'd,* 603 F.3d 316 (6th Cir. 2010); *see also Wright v. Lazaroff,* 643 F.Supp.2d 971, 979, 1001-05 (S.D. Ohio 2009) (Barrett, J.; Hogan, M.J.) (and cases cited and quoted therein); *Smith v. Brunsman,* 626 F.Supp.2d 786, 788, 792-95 (S.D. Ohio 2009) (Barrett, J.; Black, M.J.) (noting that "both the federal district courts and Ohio courts have rejected *ex post facto* challenges to the *Foster* decision"); *Kelley v. Brunsman,* 625 F.Supp.2d 586, 594, 605-08 (S.D. Ohio 2009) (Spiegel, S.J.; Hogan, M.J.); *Rettig v. Jefferys,* 557 F.Supp.2d 830, 841 (N.D. Ohio 2008) (Polster, J.; McHargh, M.J.) (citing Ohio cases "uniformly reject[ing] *ex post facto* challenges to the *Foster* decision"); *Smith v. Welch,* No. 3:08cv2917, 2009 WL 2167863, at *1-3, *13-16 (N.D. Ohio July 17, 2009) (Economus, J.; Vecchiarelli, M.J.) (unpublished); *Schaub v. Brunsman,* No. 1:08cv2522, 2009 WL 2143746 (N.D. Ohio July 16, 2009) (Boyko, J.: Perelman, M.J.) (unpublished); *Mason v. Brunsman,* No. 1:07cv1020, 2009 WL 2169035, at *8-9, *34-37 (S.D. Ohio July 16, 2009) (Spiegel, S.J.; Black, M.J.) (unpublished); *Clagg v. Wolfe,* No. 2:08cv144, 2009 WL 1424427, at *1-6 (S.D. Ohio May 20, 2009) (Sargus, J.) (unpublished); *Pena v. Cooper,* No. 2:08cv195, 2009 WL 1324046, at *1, *16-19 (S.D. Ohio May 12, 2009) (Smith, J.; Abel, M.J.) (unpublished); *Newman v. Wilson,* No. 5:08cv483, 2009 WL 1212262, at *1, *11-12 (N.D. Ohio Apr. 30, 2009) (Oliver, J.; Perelman, M.J.) (unpublished) (and cases cited therein);

*Trewartha v. Brunsman,* No. 2:07cv981, 2009 WL 614963, at *1, *10-13 (S.D. Ohio Mar. 5, 2009) (Holschuh, J.; Abel, M.J.) (unpublished); *Haning v. Wolfe,* No. 2:07cv1093, 2009 WL 541156, at *1, *3-5 (S.D. Ohio Feb. 27, 2009) (Watson, J.; Abel, M.J.) (unpublished) (and cases cited therein).[14]

The same reasoning contained in these numerous decisions unanimously rejecting *ex post facto* challenges to *Foster* applies to the case-at-hand.  *Foster* did not change the elements of the offenses that petitioner was convicted of committing, and petitioner faced the same penalty ranges in sentences for those offenses both before *Foster* (when he committed the offenses) and after *Foster*. *Cf. McGhee v. Konteh,* No. 1:07cv1408, 2008 WL 320763, at *11 (N.D. Ohio Feb. 1, 2008) (unpublished).

Accordingly, in sum, petitioner is not entitled to habeas relief based on the claims alleged in Grounds Six and Seven of the petition challenging the trial court's resentencing decision.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended (Docs. 3, 13) be **DENIED** with prejudice.

2.  A certificate of appealability should not issue with respect to the claims alleged in the petition, which this Court has concluded are waived and thus procedurally barred from review, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[15]  A certificate of appealability also should not issue with respect

---

[14] *Cf. Collins v. Warden, Chillicothe Corr. Inst.*, No. 3:06cv256, 2008 WL 728390, at *1, *8-9 (S.D. Ohio Mar. 17, 2008) (Rice, J.; Merz, M.J.) (unpublished) (holding that "[w]hile Petitioner's original sentence violated *Blakely,* his new sentence [under the *Booker* remedy adopted in *Foster*] did not," and that "[n]othing in the United States Constitution calls such a sentence into question").

[15] Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in any procedurally-defaulted grounds for relief.  *See Slack,* 529 U.S. at 484.

to the claims alleged in the petition, which were addressed on the merits herein, in the absence of a substantial showing that petitioner has stated a "viable claim of the denial of a constitutional right" or that the issues presented are "adequate to deserve encouragement to proceed further."  *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  June 14, 2010               s/ J. Gregory Wehrman
           cbc                     J. Gregory Wehrman
                                   United States Magistrate Judge

G:\08-820denypet.sufficevid-felass-aggrob-firearmspec.batson.waiv-plainerr-fedQ-delreopen.foster-expostfacto.wpd

48

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

_____

Martinez A. Terry,
      Petitioner

        vs                          Case No. 1:08cv820
                                    (Spiegel, S.J.)

Warden, Lebanon Correctional
Institution,
      Respondent

# NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **within 14 days** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **within 14 days** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).